## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SARAH HERNANDEZ,<br>　　　*Plaintiff*,<br>　　　v.<br>ENFIELD BOARD OF EDUCATION, THE TOWN<br>OF ENFIELD, and WALTER J. KRUZEL,<br>CHAIRMAN, ENFIELD BOARD OF EDUCATION<br>(in his official capacity),<br>　　　*Defendant*. | No. 3:19-cv-1907 (MPS) |

## RULING ON MOTION TO DISMISS

Plaintiff Sarah Hernandez, a former member of the Enfield Board of Education ("Board"), brings equal access and discrimination claims against the Town of Enfield ("Town"), the Board, and Walter J. Kruzel, Chairman of the Board ("Chairman"), under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"). Compl., ECF No. 1 at 2. The Town moved to dismiss Hernandez's complaint as to the Town under Fed. R. Civ. P. 12(b)(6). ECF No. 24. For the reasons set forth herein, the Town's motion to dismiss is denied.

## I.    BACKGROUND

The following facts are drawn from Hernandez's complaint and are accepted as true for the purpose of this motion.

Plaintiff Sarah Hernandez was a member of the Enfield Board of Education from November 2017 until her term ended on November 12, 2019. Compl. ¶ 1. Hernandez is autistic, hard of hearing, and has auditory processing challenges, among other disabilities. *Id.* ¶ 7. In July 2017, when Hernandez applied to serve on the Board, she contacted the Enfield Democratic

1

Town Committee to request accommodations for her disabilities and received appropriate accommodations during the campaign. *Id.* ¶ 13.

At her first meeting upon election to the Board on November 14, 2017, Hernandez informed the members of the Board of her communication preferences, including (1) written communication (e.g., via text or email, rather than telephone) between Board meetings; (2) a white board for note taking in executive sessions (which could be erased at the end of the session); (3) seating where she could pass notes to other Board members during meetings; and (4) that others face her when speaking. *Id.* ¶ 14.

Soon after this meeting, Minority Leader Tim Neville attempted to engage Hernandez in extensive verbal communication and, after she reminded him that she preferred to communicate in writing, he replied that written communication was not always possible because it could be misused, and that he preferred to communicate in person or by phone. *Id.* ¶ 15. In January 2018, Neville contacted Hernandez by phone and, during the call, he refused to communicate in writing. *Id.* ¶ 16. The call lasted approximately one hour, resulting in Hernandez's inability to process it contents and causing her physical pain due to sensory dysregulation. *Id.* Afterwards, Board secretary Tina LeBlanc offered to be Hernandez's primary contact person with the Board because of Neville's unwillingness to communicate in writing with Hernandez. *Id.*

In February 2018, Hernandez again requested written communication and documentation during executive sessions of the Board. *Id.* ¶ 17. Neville refused this request, and instead offered to speak with Hernandez if she needed clarification. *Id.*

In October 2018, LeBlanc stopped communicating with Hernandez. This break in communication with her primary contact at the Board caused Hernandez to suffer extreme anxiety and panic attacks that led to her hospitalization. *Id.* ¶ 18.

In early 2019, Neville contacted Hernandez by phone and left her a voicemail requesting a return call. *Id.* ¶ 19. Hernandez responded via text, but Neville insisted that she call him by telephone. *Id.* Hernandez again responded by text and stated that she needed written communication. *Id.* On February 4, 2019, Neville sent Hernandez an email response, but stated that he could not agree to honor her need for written communications in the future. *Id.* At the end of the email, Neville offered further in person or phone discussion. *Id.* When Hernandez read Neville's email, she experienced severe emotional distress and anxiety because, without written communication, she cannot effectively communicate and participate in Board activities and service. *Id.* ¶ 20.

On March 13, 2019, upon her request, Hernandez met with Walter Kruzel, Chairman of the Enfield Board of Education, and Superintendent Chris Drezek to discuss her communication accommodations. *Id.* ¶ 21. Kruzel and Drezek agreed to provide her with written documents for Board executive sessions that would be collected at the end of the session to ensure confidentiality. *Id.* They also agreed to develop an accommodations process for incoming Board members. *Id.* During the Board meeting that same night, Hernandez received written documents for the executive session and returned them at the close of the session. *Id.*

On March 24, 2019, at a Board caucus meeting, Neville "chastise[d]" Hernandez and informed her that she was not entitled to written communication. *Id.* ¶ 22. After Hernandez referenced the March 13 meeting with Kruzel and Drezek, Neville agreed to provide Hernandez with written communication. Neville's "verbal attack upon Ms. Hernandez caused her severe physical, mental, and emotional distress." *Id.*

At a Board executive session on June 19, 2019, Board Counsel Christine Chinni began to discuss Hernandez's communication needs in the presence of the entire Board. *Id.* ¶ 23. Chinni

stated that "the Board would no longer honor her communication accommodation needs" and instructed the Board members to speak with Hernandez only in public and to share no privileged information with her. *Id.* The Board did not provide Hernandez with any written documentation for this meeting. *Id.* Hernandez "was unable to fully comprehend Ms. Chinni's verbal communication" at the June 19 meeting. *Id.* ¶ 24. Ms. Chinni "led her to believe" that she had been removed from the Board. *Id.* Hernandez "immediately left the meeting and experienced a panic attack" before arriving at her home. *Id.*

Based on her therapist's recommendation, Hernandez did not attend the next Board meeting that took place in September 2019 because of "the strong likelihood that the meeting would result in further physical, mental, and emotional distress related to her disabilities." *Id.* ¶ 25. Nevertheless, Hernandez "continued to experience severe physical, emotional, and mental distress, including panic attacks and shutdown" for several weeks and was forced to take time off work and rely on others to care for her. *Id.* ¶ 26.

Hernandez alleges that, since her election to the Board, she has experienced "tremendous physical, mental, and emotional suffering" as a result of the Defendants' refusal to reasonably modify their procedures, to provide her effective communication, and to accommodate her. Further, as a result of being unable to understand what was being said verbally, Hernandez alleges that she has experienced sensory dysregulation that has left her unable to communicate verbally, causing increased anxiety and depression; that she has been forced to miss work and undergo hospitalization and increased therapy; and that, at times, she has been forced to become dependent on her spouse for care, leaving him responsible for the well-being of Hernandez and their children. *Id.* ¶ 27.

4

Hernandez's complaint includes two counts: violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.* and 28 C.F.R. Part 35 (Count I); and violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count II). Hernandez alleges that Defendants acted with intent or with deliberate indifference, Compl. ¶¶ 44, 59, and failed to: (1) provide Hernandez equal opportunity to participate in Board services, programs, or activities; (2) provide auxiliary aids and services to ensure equally effective communication with Hernandez; and (3) reasonably modify their policies, practices, and procedures as necessary to accommodate Hernandez. *Id.* ¶¶ 40-41. Hernandez further alleges that the Defendants have "otherwise discriminated, coerced, intimidated, and retaliated against" Hernandez, including by excluding her from the executive session on June 19, 2019, and subsequent confidential discussions, and by denying her access to information given to other Board members. *Id.* ¶ 42. Hernandez alleges that she has suffered and continues to suffer harm because of the ongoing ADA and Rehabilitation Act violations, and because Defendants' discrimination deters her from running for re-election to the Board. *Id.* ¶¶ 43, 46, 57.

Hernandez initiated this action on December 3, 2019 by filing the complaint against the Enfield Board of Education, the Town of Enfield, and Walter J. Kruzel in his official capacity as Chairman of the Enfield Board of Education. ECF No. 1. On January 15, 2020, Defendants Enfield Board of Education and Walter Kruzel filed an answer to the complaint. ECF No. 19. On February 21, 2020, the Town of Enfield moved to dismiss Hernandez's complaint as to the Town of Enfield under Federal Rule of Civil Procedure 12(b)(6). ECF No. 24.

## II.   LEGAL STANDARD

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true all of the complaint's factual allegations when evaluating a motion to dismiss, *id.*, and "must draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014).

## III.   DISCUSSION

The ADA was enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2018). Title II proscribes discrimination against individuals with disabilities with respect to access to public services, and provides that: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (2018).

"[A]lthough there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (internal quotation marks omitted). Unless one of

6

these "subtle differences" applies to a particular case, courts in the Second Circuit treat claims

under the two statutes identically. *Id.*; *see also Weixel v. Bd. of Educ.*, 287 F.3d 138, 146 n.6 (2d

Cir. 2002) ("Apart from the Rehabilitation Act's limitation to denials of benefits 'solely' by

reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the

reach and requirements of both statutes are precisely the same.  Neither difference is significant

to the instant appeal; therefore, it is not necessary to consider plaintiffs' claims under each statute

separately.").  Because none of these differences is relevant here, I consider Hernandez's ADA

and Rehabilitation Act claims together.

The ADA's implementing regulations further refine the statutory mandate.  A public

entity may not, on the basis of disability, "[d]eny a qualified individual with a disability the

opportunity to participate as a member of planning or advisory boards[.]"  28 C.F.R. §

35.130(b)(1)(vi) (2020).  Public entities are required to "make reasonable modifications in

policies, practices, or procedures when the modifications are necessary to avoid discrimination

on the basis of disability, unless the public entity can demonstrate that making the modifications

would fundamentally alter the nature of the service, program, or activity."  *Id.* § 35.130(b)(7)(i).

Public entities have a duty to ensure that communications with persons with disabilities are "as

effective as communications with others."  *Id.* § 35.160(a)(1).  With respect to communications,

such public entities "shall furnish appropriate auxiliary aids and services where necessary to

afford individuals with disabilities, including applicants, participants, companions, and members

of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program,

or activity of a public entity."  *Id.* § 35.160(b)(1).  It is unlawful for public entities: (1) to

"discriminate against any individual because that individual has opposed any act or practice" of

discrimination under Title II, *id.* § 35.134(a); or (2) to "coerce, intimidate, threaten, or interfere

with" an individual on the basis of her exercise of any right granted under Title II, *id.* §
35.134(b).  Lastly, a public entity's obligations under the ADA and Rehabilitation Act cannot be
delegated, even where the authority and funding to execute the program at issue is delegated.  42
U.S.C. § 12131 (2018) (defining the term "public entity" to mean, in relevant part: "(A) any
State or local government; [or] (B) any department, agency, special purpose district, or other
instrumentality of a State or States or local government . . . ."); *see also Henrietta D.*, 331 F.3d at
287 (affirming district court's order holding the State of New York liable for failing to ensure
that the City of New York complied with ADA and Rehabilitation Act requirements).

 To establish a prima facie case of discrimination in violation of the ADA and Section 504
of the Rehabilitation Act, the plaintiff must demonstrate that (1) she is a "qualified individual"
with a disability; (2) that the defendants are subject to the ADA; and (3) that the plaintiff was
denied the opportunity to participate in or benefit from the defendants' services, programs, or
activities, or was otherwise discriminated against by the defendants, by reason of the plaintiff's
disabilities. *Henrietta D.*, 331 F.3d at 272.  In addition, to establish a violation under the
Rehabilitation Act, a plaintiff must show that the defendants receive federal funding. *Id.*
Plaintiff asserts, and the Town does not contest, that Ms. Hernandez is a qualified individual with
disabilities, that the Town is subject to the ADA and the Rehabilitation Act's requirements, and
that the Board denied Hernandez her rights under both statutes. *See* ECF No. 24-1 at 8, 11;
Compl. ¶¶ 36, 38, 42, 54, 57.

 The Town argues, however, that Hernandez has failed to allege any facts that suggest that
the Town has done anything to discriminate against her because of her disability, pointing out
that the complaint says very little about the Town other than that it is a municipality and "at all
times . . . , acted as a government entity through its duly authorized agents, employees and/or

representatives." Compl. ¶ 10.  The Town also points out that it and the Board of Education are separate legal entities, each capable of suing and being sued.  Because the plaintiff alleges wrongdoing only by members of the Board, the Town's argument goes, the plaintiff has failed to plead a claim against it.  ECF No. 24-1 at 8, 9.  Plaintiff responds by asserting that the Town is liable for the actions of the Board under the ADA and the Rehabilitation Act because the Board and its members are the Town's agents, and because the Town maintains liability insurance for the Board, "thereby acknowledging that it is responsible for the Board's conduct."  ECF No. 32 at 7-8, 10.  Because I find that Connecticut law makes the Board and its members agents of the Town with respect to the conduct alleged in this case, and because no one disputes that the complaint adequately pleads ADA and Rehabilitation Act claims against the Board, I agree with the plaintiff.

Local boards of education in Connecticut are unusual in that they exercise "dual agency" on behalf of the state as well as the municipalities they serve.  *Rettig v. Town of Woodbridge*, 41 A.3d 267, 277 (Conn. 2012); *see also Purzycki v. Fairfield*, 708 A.2d 937, 942 (Conn. 1998), *overruled on other grounds by Haynes v. Middletown*, 101 A.3d 249, 261-62 (Conn. 2014) ("[O]ur jurisprudence has created a dichotomy in which local boards of education are agents of the state for some purposes and agents of the municipality for others.").  As the Town points out, local boards of education have independent legal existence and are capable of suing and being sued.  *See Bd. of Educ. of Town and Borough of Naugatuck v. Town and Borough of Naugutuck*, 843 A.2d 603 (Conn. 2004) (lawsuit between local board of education and its town over charter amendment concerning board's budget); *Cahill v. Board of Education*, 444 A.2d 907, 912 (Conn. 1982) ("[A] a local board of education is bound by and may sue or be sued on contracts in the

same manner as municipal corporations.").  Nevertheless, local boards are only empowered to act pursuant to authority delegated to the board either by the state or by the municipality.

Boards of education act as agents of the State when they act, under authority delegated by the State, to fulfill the State's duty under the Connecticut Constitution to educate the children in each municipality.  Conn. Const. art. VIII, § 1 ("There shall always be free public elementary and secondary schools in the state.  The general assembly shall implement this principle by appropriate legislation."); Conn. Gen. Stat. § 10-220 (2019) ("Each local or regional board of education shall maintain good public elementary and secondary schools, implement the education interests of the state, . . . and provide such other education activities as in its judgment will best serve the interests of the school district . . . ."); *Town of Cheshire v. McKenney*, 438 A.2d 88, 91 (Conn. 1980) ("[L]ocal boards of education act as agencies of the state when they are fulfilling the statutory duties imposed upon them pursuant to the constitutional mandate of article eighth, s 1, i.e., to provide for 'free public elementary and secondary schools.'").

For all other purposes, however, boards of education are "agents of the municipality they serve . . . ."  *Id.*  In particular, boards of education are empowered to act on their municipalities' behalf because the State has delegated some of its educational functions to municipalities, which, in turn, have delegated them to local boards of education.  Conn. Gen. Stat. § 10-240 (2019) ("Each town shall *through its board of education* maintain the control of all the public schools within its limits . . . .") (emphasis added); *McKenney*, 438 A.2d at 91 ("[T]he state, in the exercise of its policy to maintain good public schools, has delegated important duties in that field to the towns. . . .  Local boards of education act on behalf of the municipality, then, in their function of maintaining control over the public schools within the municipality's limits.") (internal quotation marks and citations omitted).  Further, "members of the board [of education],

as officers of the city, exercise[] *their* authority on behalf of the [municipality]." *Rettig*, 41 A.3d at 277 (emphasis in original); *see also McKenney*, 438 A.2d at 91-92 ("The members of local boards of education are invested with the powers of their office by municipal action.  They are either elected by local constituencies; [*see* Connecticut] General Statutes s 9-203; or, pursuant to the town charter, are appointed by an elected officer or body of the municipality. . . . [M]embers of a local board of education are officers of the town they serve . . . ."); *Sansone v. Bechtel*, 429 A.2d 820, 823 (Conn. 1980) (concluding that members of board of education are agents of state only "when carrying out interests of state" but its members are town officers).  Likewise, board of education employees are considered employees of their respective municipality.  *McKenney*, 438 A.3d at 92 ("[T]he persons employed by [boards of education] in the performance of their statutory functions are employees of the town."); *see also Rettig*, 41 A.3d at 277-78 (reaffirming the Connecticut Supreme Court's repeated holding "that the board [of education's] dual agency in no way undercut[s] the employer-employee relationship between the municipality and the board's employees.") (collecting cases).

The agency relationship between the municipality and its board of education goes beyond employment matters.  The Board is subject to control by the Town in all but its state-mandated activities.  Conn. Gen. Stat. § 10-220(a) (2019) ("Each local or regional board of education . . . shall perform all acts required of it by the town . . . ."); *see also id.* § 10-218 (providing that town council chooses officers of the board in the event of a tie vote among board members); *id.* § 10-222 (requiring local school board to submit annual budgets to town finance boards to receive money appropriated by town); *id.* § 10-225 (allowing town to fix salary and compensation of board secretary and attendance officers); *id.* § 10-241 (empowering school boards "to make . . . regulations for the establishing and conducting of schools not inconsistent with the regulations of

the town having jurisdiction of the schools in such district."); *id.* § 10-241a (permitting local school boards to take land by eminent domain only with the approval of the legislative body of the town).

Consistent with these principles, Connecticut courts have narrowly defined the activities in which a school board acts as an agent of the State, rather than as an agent of the municipality, to include only actions that "would operate to control the activities of the state or subject it to liability . . . ." *Graham v. Friedlander*, 223 A.3d 796, 813-14 (Conn. 2020). In most cases in which the issue has been litigated, Connecticut courts have found that the party claiming that the board was an agent of the state has failed to satisfy this test. For example, the Connecticut appellate courts have held that a local board of education, or its employee, was acting as an agent of the municipality, and not the state, where: (1) the board hired special education teachers, *Graham v.*, 223 A.3d at 800, 817 ("in providing special education services, . . . the board defendants were acting under the control of, and as an agent of, the municipality rather than the state . . ."); (2) a teacher hired by the board brought a breach of contract action against the board, *Cahill*, 444 A.2d at 912 ("A breach of contract between a local board of education and its employees does not give rise to a conclusion that such an action would operate to control the activities of the state or subject it to liability."); (3) a pupil brought an action to recover damages for personal injuries caused by the negligence of a teacher, *Sansone*, 429 A.2d at 820; and (4) a teacher who sought to hold a position on the town council did so in violation of the town's charter, which barred municipal employees from serving on the town council, *McKenney*, 438 A.2d at 91. Even where a board's acts related to a policy it had developed and enacted while implementing a state statute, the Connecticut Appellate Court found those acts were attributable to the municipality, not the State. *Palosz v. Greenwich*, 194 A.3d 885, 892 (Conn. App.), *cert.*

12

*denied*, 194 A.3d 778 (Conn. 2018) (holding that "the defendant [board of education] was acting as an agent of the municipality, and not the state, when its employees allegedly failed to comply with the [antibullying] policy it had adopted [as required by a Connecticut statute]" even though the policy had been adopted by the board independent of town action).  Indeed, in *Graham*, the Connecticut Supreme Court suggested, without deciding, that the area in which a board of education acts as agent of the state was limited to "certain enumerated board actions, such as the development or design of a policy pursuant to state statute . . . ."  223 A.3d at 816.  Outside of this narrow area, the board acts as agent of the municipality under the general authority delegated to the board by the municipality under Conn. Gen. Stat. § 10-240.  *Id.* at 815 (affirming the reasoning of the Connecticut Appellate Court in *Palosz*, which stated that a board of education "acts as an agent of the municipality when it enforces and complies with . . . [policies] pursuant to its general powers of control over public schools, which is explicitly delegated to a local board of education through the municipality pursuant to § 10-240.") (alterations in original).

Here, the conduct at issue relates to the Board's internal communications, functions, and, in particular, accommodation of members who are considered disabled under the ADA and the Rehabilitation Act.  As recounted above, Ms. Hernandez's allegations describe her frustrated attempts to receive reasonable accommodations for her disabilities so that she could fulfill her responsibilities as a member of the Enfield Board of Education.  The parties have cited no state statute governing internal board functions of this type, and the Town has not suggested that the board's alleged actions in this case carried out any state policy.  Consequently, holding the Board liable for the failures alleged by Ms. Hernandez would not "operate to control the activities of the state or subject it to liability . . .", *Graham*, 223 A.3d at 813-14, and the allegations against the Board do not otherwise fall within the narrow band of activities in which a board acts as an

agent of the state.  Although it is true that the only allegations against the Town are that it is a public entity that acted "through its duly authorized agents, employees, and/or representatives[,]" Compl. ¶ 10, that is sufficient because, under Connecticut law, the alleged actions of the board members and its employees were taken pursuant to their authority as officers and employees of the Town.  When the Board responded to, and allegedly denied, Ms. Hernandez's requests for reasonable accommodations for her disabilities, it was acting on behalf of the Town of Enfield.

The Defendant argues that "[t]here is no allegation that the Town directed or had the power to direct the Board's executive sessions, accommodation decisions, or any of its 'services, programs or activities[,]'" and, as a result, "no cognizable claim of disability discrimination has been pleaded against the Town."  ECF No. 24-1 at 9.  The Defendant asserts that this is so because "[t]he only allegation specific to the Town in the complaint states that it is a municipality and, at all times relevant, 'acted as a government entity through its duly authorized agents, employees, and or representatives.'"  *Id.*  The Town then states that "[t]here are no actions [in the complaint] attributed to any agents, employees or representatives of the Town – as opposed to the Board – in the complaint."  *Id.*  But this argument expressly overlooks the fact that the Board, its members, and its employees *are* agents of the Town.  As a result, the Town can be held liable for the actions of the Board.  42 U.S.C. § 12131; *Henrietta D.*, 331 F.3d at 265, 284-87 (affirming the district court's decision to hold the state defendant liable for the city defendants' failure to provide reasonable accommodations under Title II of the ADA and Section 504 of the Rehabilitation Act).

In sum, Hernandez has alleged sufficient facts to state a claim against the Town because: (1) she has stated a prima facie ADA and Rehabilitation Act claim against the Board, an agent of the Town; and (2) the ADA and Rehabilitation Act impose obligations on public entities that

14

cannot be delegated.  As a result, Hernandez has plausibly stated a claim for which relief may be granted against the Town of Enfield.

**IV.      CONCLUSION**

For the foregoing reasons, Defendant Town of Enfield's motion to dismiss, ECF No. 24, is hereby DENIED.

IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                August 19, 2020